Case number 15-3003. United States of America appellate v. Joseph Daniel Hallford. Mr. Sable for the appellate, Ms. Jeffress for the appellate. May it please the court, David Sable on behalf of the United States, good morning. This was a legally erroneous conclusion by the court. The court failed to take account of the requirement of Colorado v. Connolly that there must be substantial police coercion causing the statement. Under the case law, the government action, even as the court found the facts to be, did not rise to the level of a due process violation. The district court's conclusion did not account for the fact that the appellee twice declined to consent to searches of his medical records and of his car. This fact stood in stark contrast to the will had been overborn. The court did not account for the fact that appellee understood the difference between medical detention and police custody because he twice said, am I in trouble? Am I under arrest? And the agents told him, no, you're not in trouble. You're not under arrest. He understood the difference, your honor. And finally, the district court didn't account for the fact that before the interview, the agent spoke to the staff at GW Hospital. They took a couple of minutes at the interview to assess Kelly's demeanor. And so they had no way of knowing of being on notice that there were these subjective vulnerabilities of appellant of a Kelly that they needed to be aware of. And this court has said that where the district court errs in weighing the totality of the circumstances in a voluntariness case, it will reverse. And that's the unit's case from this circuit. Moreover, under the unit's case, the unit's case is helpful because it instructs it's it's it teaches on some a lot about the voluntariness analysis. One thing that the unit's case says is the best barometer of the defendant's subjective ability to make a voluntary statement is his behavior at the time. And so in units, for example, the defendant had fractured wrists. He was kept in a hot room. He was seasick. And the court said, Look, he was alert. He was lucid. He was able to give a detailed statement. He agreed to speak. And so we're gonna look at those factors. And that's the best barometer of whether the statement is voluntary. We're also gonna we're also gonna look at those factors and understand that the defendant here was not would not have understood the hot, cramped room. He would not have seasickness as induced towards making an involuntary statement. And here, the same is true. Appellee would have understood. Yes, I'm in a hospital. Yes, you know, I don't. I'm tired. I may be hungry, even though he's refusing food, but he would not have understood these factors to go towards any kind of compulsion to make an involuntary statement. But the problem that I see with that argument is that the Secret Service are the very first people that it appears that he speaks to from this record once he's taken to the United Medical Center. I mean, he's been strapped to a gurney and involuntarily committed against his will and taken from GW Hospital to U. M. C. And before he even talks to a doctor there, the first people he's brought to see by hospital staff are Secret Service agents who are asking him about statements he made to the doctors at GW. So doesn't that create a circumstance where he would reasonably believe that he needs to talk to these Secret Service agents if he wants to get out of there? Well, with respect, Your Honor, I don't think that those are quite the facts. I think that, um, he's told at GW that he's being committed by the doctors and the nursing notes there say he was explained to him. He didn't like it, but it was explained to him. And then when he gets to U. M. C. They haven't evaluated him, but he's somewhere in the building and he's brought by the medical staff, including the doctor in the building into this doctor's lounge. So we don't know exactly what had taken place, but it doesn't appear that it's on, right? I'm sorry. You didn't put any evidence on about that. Uh, well, what? Yes. Well, what the agent said is we came to U. M. C. We asked to see him and they said, We're going to put you in this room. Is that okay? And they said they said yes. And then he is brought to the room by what you didn't put on any evidence about what the medical staff told him about what this meeting was for, why he was going there or any of that, right? No, we don't have that at U. M. C. We do have the medical records from U. M. C. And we have the medical records from G. W. Your honor. And the medical records from G. W. Say that the F. D. 12 was explained to him and that he didn't agree with it, but it had been explained to him. All right. But the medical records from U. M. C. At least my review of him doesn't reveal anything about what he was told before he was brought in to see the Secret Service. I don't recall seeing that either, your honor. But I don't think it would be reasonable to infer from those medical records that he hadn't talked to anybody at all. I mean, they hadn't completed the initial assessment of him, but it doesn't appear that he arrived contemporaneously with with the appellee with with the agents. The district just suppressed two items of evidence. One statements to the agents and the other. The I'm hard put to see why his statements to the agency matter in light if you had the evidence derived from from his car. Uh, your honor, the only reason that the agents were able to find his car and knew to find his car was the fact that he had told them that he had the statement. And so I understand that's the theory that Judge Leon used. But my question is, let's suppose that he's wrong, that the evidence from the automobile should be suppressed. Do we even have to reach the question whether the defendant was in custody at the hospital and therefore the statement should be suppressed to what? What difference does it make what he said in the hospital in light of the evidence found in his car? Well, that would be right. If if there were another and we did argue at the trial level, your honor, that the evidence would have been inevitably discovered because the car had been ticketed twice and it was in a public area. Shocked that it wasn't toad. Exactly. It would have been. Certainly it would have been toad. It would have been found. It was in a high traffic area where the park police routinely patrol. And so in that sense, there would have been a basis for advancing for for locating that car. Make an X. V. Williams argument before us. No, we did not, your honor. But I'm still back to my question and maybe you don't understand it. Let's suppose that we assume that he was in custody. Assume that at the hospital. Yes, your and and that the district court should have held that as a result of that, his statements should have been not should not have been suppressed. Assume that that he was that he should have been warned, but it was nonetheless voluntary. Is that what the court is saying? No, I'm saying suppose the district court was wrong and holding that he was in custody. Oh, I'm sorry. Thank you. And therefore, the district court earned suppressing the statements that he made at the but it was a harmless error because those statements didn't amount to a hill of beans in light of the evidence from the car. Well, yes, it would. That would be perhaps if if there had been a trial, right? But there hasn't been a trial at this point. There hasn't been a trial at this point. Certainly, if the statement is voluntary, but nonetheless taken in violation of Miranda under pertain, the evidence nonetheless becomes available. If the evidence would inevitably have been discovered, then the evidence would be available in the statements are of little moment at trial. That's correct. We haven't had a trial. I understand. Yeah, I'm sorry, Your Honor. Maybe I'm not correctly grasping the thrust of your question. 18 U. S. C. 37 31. Right. We took the interlocutory appeal. Yes. Can I ask you about something different? The government here makes a sort of unusual argument in asking the court not to consider the trial judges written decision. Um, and is that still the position of the government that those are so it is our position, and we made the argument in the brief. Your Honor, I don't think it's something that the court needs to reach, nor do we feel the court needs to reach the findings of clear error because we think the voluntariness finding is error in and of itself, even as the court found the facts. But we do think that it's unfair to consider a written opinion, even if it's only embellishment of the earlier findings after the after any party has briefed the case. It just gives an appearance of impropriety that this court should not be a party to. That's our view of it. That seems to be what the First Circuit is saying. Nobody's pointing any fingers or making any accusations, but it's sometimes these opinions could be helpful to the court to memorialize what the district court wants to say. We understand that this court hasn't said that. But in this circumstance, it probably comes two months, two months too late. What was the timing on that? You had 30 days to file your notice of appeal and filed on the 30th day. We waited on purpose to the last day for that very reason. So they are because Leon said, I'm going to furnish an opinion, right? So the case was argued in August. When we got to December, he said, I didn't have a chance to write it. But here, my oral findings, the appellant was released. Uh, we he said, I'm gonna issue a written finding because I know you're going to appeal me. So give me a chance to do that. So we waited to the 30th day. We filed the notice of appeal. That was mid January, and the written order didn't come out until May. So your contention is that is that the the police in in order to really fall within the Supreme Court case law, um, with respect to involuntariness, there needs to be some evidence of actual police coercion in the sense of deception or something of that nature, right? That's your position. Yes, that's, um, and I guess what I'm trying to drill down on here with my earlier question and where I am now is if the Secret Service, based on all the evidence, understands that this person has been involuntarily committed in that he's been committed and the basis of the commitment or statements that he's made to doctors at GW and immediately upon his commitment, they asked to speak to him about statements. Those statements he made to the doctor at GW. They're in effect asking him about the basis of his commitment. And why wouldn't he perceive that he needs to cooperate with that if he wants to not be involuntarily committed anymore? A couple things, Your Honor. First of all, he's committed at GW. He's not moved to UMC because he's committed. He's moved to UMC because it's a psychiatric facility. He's committed at GW, and he's there for almost 24 hours before he's moved to UMC. Secondly, in these medical detention cases, this is typically the person goes to the hospital. A person who's in a car crash goes to the hospital. The doctors are treating him because of the car crash. The police want to talk to him because of the car crash. But a reasonable person or even a subjective person, you know, a person subjectively would understand there's a difference between the doctors are here to treat me and the police are here to ask me about potential criminal activity. You know, I'm making a bomb in my house and the bomb blows up. I go to the hospital because my fingers are the police are going to come talk to me because they're concerned about a bomb going off. So it gives rise to both. But people understand the police in the in the hypothetical you're opposing. The police don't potentially hold the keys to whether you get out of the hospital or not. And they didn't hear they didn't hear what they do if you're perceived is not cooperating with them and they're asking you about the statements that were the basis of your hospitalization. So the insight that we have into a Pelley's thought process is the agent show up and he says, Am I in trouble? Am I under arrest? And they say, No, you're not in trouble or under arrest. We just want to talk to you about your statements. And then after he tells them about the guns, he says, Am I going to be arrested? And they say, Well, that's not up to us. We're gonna have to. That's up to the prosecutors to make that decision. He understood the difference. And when he wanted to say no, you can't look at my medical records. No, you can't look in my car. He was able to say that. How can you say he was so volitionally impaired? How can you say that the agents just by being nice so overbore his will that he wasn't able to say no, that that's an involuntary statement. Yes, we have to assume because the expert said it that he was volitionally impaired and that the agents, uh, did. He was volitionally impaired. But that was Colorado versus Connelly. You know, in Colorado versus Connelly, they knew he they knew he'd been involuntary. He had psychological problems. They've been involuntary hospitalized, but they took his statement anyway because he seemed okay at the time. And what Justice Rehnquist said in Colorado versus Connelly is there's no right to make a there's no right of a criminal defendant to confess to his crime only when totally rational and properly motivated. We don't know why people choose to confess. Usually it's a bad idea, but they do that. There has to be a quantum of government coercion or else it's simply not a due process violation. We're talking about a due process violation. And I just want to say these agents are assigned to the protective intelligence detail. Okay, what they do is when somebody threatens the president, when somebody makes a threat that or makes a comment that could be a concern to somebody they protect, they go out and they complete their threat assessment questionnaire. They ask these questions and they include what did you do? What did you say? But they also include Do you have military service? Do you have any weapons? Because they're gonna alert people relevant authorities, whether it's a crime or not, to this information. They're assessing the not made a single arrest. He's not trying to trick anybody. I grant you that there are times and a lot of these people have mental issues that they end up talking to. I grant you there are times they're probably gonna talk to people and maybe the statement will end up being involuntary. And then you have a Hobson's choice of assess the threat or maybe lose the evidence. But this isn't such a case. Did the did the agents know before they began questioning the defendant that he drove to the mall with a car and left it here and didn't know where it was. They knew that he had driven the car, but they didn't know where it was. They knew that they knew he was on the Korean War Memorial and that he had to take a cab or an ambulance to the hospital. Did they know that? Because the hospital staff told him that yes. Was there any motion to suppress the statements that he made to the hospital people? Uh, not to my knowledge. No, I'm going to trial counsel who's indicating no. Do we know what those statements were? By the way, was there any evidence put on regarding what he said? Not to the agents, but to the hospitals? I don't recall. And I would have to look to see if it was anything about a car. Actually, I do recall he said it is in the hospital records that he said that he had driven from Alabama the day before they stayed at a hotel and that he had gone to the mall that he had participated in this anonymous demonstration that he didn't like what people had said that he buried his chest and dared the Secret Service to shoot him because he wanted to own the Secret Service that he threatened a doctor if he didn't get his pain medication at GW. That that is all in the record. And that's what triggered the Secret Service is interested. That's exactly right. So the GW then sends an email to the Secret Service. Hey, we think maybe we should talk to this guy and then they go to GW. Well, he's no longer there. He's at UMC. So then they drive down to UMC. This is the next day and UMC has not yet completed their initial evaluation. And that's how we get to this point. If there are no further questions, we'd ask that the court reverse the voluntary is finding. Thank you. Yeah. May please the court. Uh, Jonathan Jefferson on behalf of Mr. Halford. Um, the district court correctly found that under the totality of the circumstances here, Mr. Halford statements were involuntary. District Court applied the appropriate legal standard and correctly assessed both sides of the equation. The actions of law enforcement and the circumstances of Mr. Hoffer, the circumstances Mr. Hoffer was in. Um, a useful way to approach this. The analysis here is to compare the circumstances and the result of the interview law enforcement conducted on November six with the interview they attempted to conduct on November 8th. On November 8th, Mr Halford's involuntary commitment expired and he was formally arrested. He was released, um, to law enforcement, formally arrested and transported to a police station. Um, at this point, he'd been provided psychiatric treatment for two days. Um, he'd been, uh, you know, he had undergone the initial assessment at U. M. C. And been told what he was there for. Um, they had stabilized him and his treating physician felt he was sufficiently stabilized that he could be released. He'd had medication for his physical ailments and a psychiatric condition. He had therapy. Um, so he was released to the police. He was given back his clothes. Um, and once at the police station, the agents again attempted to interview him. But this time they Mirandized him first. And the outcome on the eighth was that Mr Halford invoked his Fifth Amendment right to remain silent. As that demonstrates really beyond dispute that in the absence of all of the course of pressures that Mr Halford was under was under from both sides of the of the equation, both the course of pressure from what the government, the agents were doing from the circumstances of his involuntary commitment. And then what was going on internally with Mr Halford, the physical issues he was working with. Those coercive pressures were the but for cause of this confession. I assume that you would agree that volitional impairment by itself is not enough to make his statement involuntary. I do agree. Okay. So what what is it then beyond what was impairing his volition, the physical you know, raise rises to the level of substantial coercion. Yeah, I would put it basically in three different categories. Um, there were things the agents affirmatively did to, you know, and I would put this in the category of what Colorado versus Connelly recognized as subtle psychological tricks that they engaged in that might not be objectionable if this was a normal circumstances, but that are objectionable under these circumstances. Um, to I would I would I would say there are things that they took advantage of that they free road on knowingly, which, you know, primarily is the fact that this man is involuntarily committed in the psychiatric ward of a hospital. Um, and that they sort of took advantage of that. And then three things they refrain from doing. What are they supposed to do? They have information from the hospital that he drove from Alabama. There's an automobile and that he was talking about violence, talking about getting shot by the Secret Service. We don't know where the car is. What are they supposed to do? Wait till he gets out of the hospital before talking to him. I mean, there's an automobile. There's a potential for that automobile to have weapons, and it's on the mall. What are they supposed to do? Well, I think in this circumstance, I mean, what what what they have took advantage of the fact that he was involuntarily Well, I'm asking you if that's taking advantage of him. What? You know, what are they supposed to do? Well, of course, I mean, as the government admitted, they can always question him. They can always always question him. And then, you know, to assess the situation and do the threat assessment that apparently they were there to do. And then they just risk losing, you know, being able to use the fruits of an involuntary statement at a later stage. So there's always that option. Um, but but more than that, I mean, in here, when you're in a compromised psychiatric state, they have to do more to make sure that the interview is voluntary. I mean, they could have. They could have Mirandized him. They could have explained he was free to leave. They could have explained he was free not to talk to them. They could have done something to communicate to him. The fact that I told him that they asked for his permission to speak to them. Well, they said they said, Can we talk to you about those statements? And the first thing they did? That's the same thing, isn't it? They said for permission, they said, Can we talk to you about your statements? They didn't say, Can we talk to you about weapons possession? They didn't say, Can we talk to you about other issues, which really might have alerted even someone in Mr. Hoffer's compromised statements? Wasn't the possibility of weapon possession reasonably related to the statements he made about getting shot by the Secret Service? Well, they say, I mean, if you look at the record of what Agent Fox said, he said, I told him I told him they were not illegal statements. They were just concern among hospital staff as well as the Secret Service. So I mean, he made realism. He made a deliberate effort. True. Yes, that is true. That that's actually that's not deceiving him at all. Although what he's really doing is he's linking his concerns and the hospital, the Secret Service's concerns and the hospital's concerns to make quite clear to Mr Hoffer that listen, if you want any chance of leaving here, you know, you need to talk to us. I mean, that's what he's doing right there. But he's you have to consider. I think this is really worse than the station house. You know, the White House seems to think that Mr Hoffer's involuntary commitment at the hospital is somehow less coercive than if he was a station house. But that's really not true. I mean, at a station house, at least someone has a frame of reference. They know they're going to see a judge. They know they're going to see a lawyer at some point. They have they know that there's some sort of background procedures that apply here. Mr Hoffer, I don't know what the government was referring to. There is no evidence that he'd been explained anything about how long he was going to be there, what the legal authority was for him being there. There's no evidence that that he was. He didn't see a judge. He didn't see a lawyer. I mean, he's really in a much worse situation, much in terms of the coercive pressure of what he is under. Then at the station, he was in a worse situation. What's that? The gentleman's named Mr House. It was questioned in a prison for 7 to 8 hours. It was certainly in a much worse situation than Mr House because Mr House knows he's in a prison where he knows the prison runs the show, not these officers coming in. He knows that those officers don't really have an ability to affect his fate, his immediate fate. Mr Hoffer has no idea. He's in this sort of legal limbo, and he's been detained now, and the government, I think, just said it accurately. He's been detained for over 24 hours. How do we know he has no idea? There's no evidence he does. There's no evidence anyone ever explained it to him. So you assume, because nobody explained that you're in a hospital, in a hospital gown, you've been committed by hospital personnel, that you assume that he didn't know that? Well, it's the government's burden here, and I would say that they have not put on any evidence that the difference between... He's in there for making anti-government statements, essentially. I mean, he's made a number of statements, but among them are anti-government statements. Two agents of the Secret Service come to see him, so two agents from the same government that he supposedly made these statements about. I think even a reasonable person... I mean, Mr. Hoffer's in a badly compromised state. We put on a psychiatrist, the government never called their own to evaluate him, and basically said that he's in a badly compromised state at this time. And I think that's pretty clear from what Dr. Kaiser, his treating physician, said as well. So in that circumstance, why would he think that these agents wouldn't control his fate? In fact, I think if these agents... Even a reasonable person would think, you know what? These agents are gonna go and they're gonna talk to this doctor who's sitting in the room with me. They're gonna talk to my treating physician and everything else. They are going to have influence over whether I'm going to stay here for who knows how long. The point is, is that nothing... There's no evidence that anything had been explained to him about his situation. So that's even more... Much more bewildering, I think, and coercive than the typical... The station house. Doesn't this get us right back to inquiring into the defendant's state of mind? And that... Connolly says, that's what we're not supposed to be doing. We're supposed to be looking objectively at what the police did to, quote, wring a confession out of. Yeah. And I would go back. I would say... Well, I think Connolly says basically you look at both sides of the equation. You can't just look exclusively... It's a factor, certainly. Right, it's a factor. But we can't... Everything can't turn on what we think he thought. And so we look at what the agents did. And one thing was, I think they made him... They minimized what they were gonna focus on during the interview to the point where it wouldn't alert him, especially someone in his badly compromised state, that they were gonna tread on issues such as firearms possession, which of course are criminal... Have criminal concerns. They also... They said you're... They prematurely said you're not in trouble when they didn't know that. He was in trouble. He was involuntarily committed for making statements. And he was on the precipice of potentially far more trouble depending on his answers to their questions. So that was sort of a false reassurance there. And then they did link their interests and the hospital's interests together, such that I think any reasonable... And this is what Dr. O'Brien found in testimony that was not rebutted by the government, in a way that Mr. Hoffer would think, these guys have either control or heavily influenced what's gonna happen here, I need to talk to them. And if they said, you don't have to talk to us, you can go back to your room. This is a voluntary interview, then maybe that would have alleviated some of the coercive pressure. But they didn't do any of that here. They did none of that here. And they certainly didn't read him his Miranda rights. Was there anything in the record about why they didn't read him his rights at the commencement of the interview? Well, the agent certainly knew that... Of Miranda rights, and he knew he could. It really did... He really didn't ever explain why he didn't do it. Why he didn't do it. And I think that the government says, well, they're there to do a threat assessment. Well, okay, if they're there to do a threat assessment, then they can do their threat assessment. But if you're there going to ask questions that tread on potentially incriminating matters, you're not going to be able to use those answers afterwards. And we know that when Mr. Hoffer, again, was read his Miranda rights on the 8th after it had been stabilized, he evoked. So we know that this is not just a technical violation of Miranda's prophylactic rule. It is a involuntary state. Government counsel tells us that the government also defended the search of the car on the basis of the inevitable discovery rule. Well, you know, the government's been quite unfair to the district court here in terms of how they've characterized. They made a lot of statements down there that are different from what... They waived that argument down there. I mean, they expressly said, we're not pursuing that argument. So, I mean, obviously, the judge didn't get around to addressing it. But also, the government characterized the agent's intent quite differently down there than they have here. So they waived the inevitable discovery contention? It was... It was clear. I think they weren't gonna win on it. Under the impound rules and everything, it didn't look like actually the car would inevitably be impounded and searched. It had tickets on it, didn't it? It did have tickets on it. And you're saying that... They have to make... It's not clear that it would have been impounded? No, because they have to make... On the mall? Mr. Halford's father was the owner of the car. They have to make reasonable contacts to contact the owner. And in fact, they did contact Mr. Halford eventually, the father, I'm sorry. And if they had done that, Mr. Halford would have gotten his car out of there, the father. So, really, I think that was... I'm speculating, I don't know their internal decision making process, but they gave up that argument very deliberately. They made it initially and then gave it up. But they also argued down there that this was necessitated by public safety. And they argued that the agents actually went into this interview with the intent of getting information out of Mr. Halford on things like firearms. So, they said that the firearms question, quote, and this is on page 48 of the appendix, quote, was necessary to determine whether Halford had the present ability to confront USS personnel with a firearm in furtherance of provoking an armed and deadly response. Likewise, when Halford responded affirmatively, the agent's subsequent inquiries were intended to assess Halford's ready access to the firearms. So, the way the government's portrayed the intention of the agents in this court is really... They did the polar opposite in the district court. And the district court's finding that the agents were looking to deceive Mr. Halford to get at this information fits very well with what they told the district court about the agents' intent. So, for them to argue now, they should really be stopped from arguing that that's a clearly erroneous factual finding at this juncture. You say that his invocation of his Miranda rights on the 8th showed that he was in control at that point. Why doesn't the fact that he refused to release his medical information and refused to give them permission to search his car show that he was in control on the 6th? Well, what the record shows is that those rights were explained to him in one of the situations a form was presented to him. And this is at the very end of the interview. At this point, the officers and agents have asked these firearms questions. One of them has gotten up very suddenly to make a call to put out a... Be on the lookout. He's left the room. So, at this point, I think the agents have sort of gotten these incriminating answers and the officer's debilitated state has realized at this point that these guys are looking... They're not my ticket out of here. As I thought, these guys were really looking to jam me up. And so, at that point, it dawned on him what was going on. And having had the rights explained to him, he was able at that point to sit down. Now, if they had Mirandized him at the beginning, I think the 8th shows, and if he had been... Had the resistance, hadn't had his powers of resistance zapped, as the district court put it, he would have been in a position to invoke. Thank you. Alright, thank you. Good morning again. Your Honor, in response to your question from the government's exhibit two on the GW note, this was admitted in a not in the... It's not in the appendix, although it should be. Notes, patient reassessed at 4 o'clock. Patient complained of being held against will and wanting to smoke. Explained to patient regarding rationale and need for involuntary admission. Contacted social worker, so forth and so on. That's in the GW notes. So, the FD12 was explained to him by somebody at GW. So, there wasn't any reason when he got to think he was taken to UMC and presented with the agents, and the agents were driving the train. The agents had nothing to do with this. Law enforcement had nothing to do with this. This was a medical issue, and he understood that it was a medical issue. Secondly, the evidence seems to be, with respect to the consent, Your Honor, with respect to your question, that with respect to one of the two instances, he was shown a form which would have said, you don't have to consent. With respect to the other, it appears that he wasn't so advised. It's not exactly clear. That's in our brief. What is clear is that even if he was told at the end of the interview, you don't have to consent. Even if he then had an oh shoot moment, let's call it. I just told the agents that I had guns in my car. I think I might be in trouble. It still shows his volitional capabilities. It still shows he's in control. He made a bad decision to talk to them. Okay, but a bad decision isn't an involuntary decision. It shows he's incapable. Two days later, sure, he makes a different decision, but that day, that hour, he's in control of his volitional abilities. The court failed to consider that fact. The court mentioned it in its findings, but failed to weigh the totality. It was error. I don't know why that's a bad decision at this point. If he's acting rationally, he realizes he left the car on the mall, and the car's gonna get recovered, and it's gonna be traced back to him. And so I might as well tell him that. Right, in the sense that he thinks he's gonna get ahead of the curve, and maybe nobody's going to hurt him, and certainly... Potentially so, Your Honor. We just don't know why people confess to certain things, but that's part of the sweeping inquiry into a subject... Have you ever read The Imp of the Perverse? No, I have not, Your Honor. I've never read it. It's by Edgar Allan Poe about a guy who commits a perfect murder, and he starts thinking to himself, I'll never be caught unless I confess. And that dogs him and haunts him, and ultimately, he confesses. Right. Well, that's what makes these things so tricky. It's a black box, and I think Justice Rehnquist said it, and Connolly, and Judge Posner said it in the Rice versus Collins. If you look at the Siddiqui case, Your Honor, if you look at the Eunice case, Siddiqui was a case where the defendant had been shot in the stomach, was medicated, was subject to soft restraints, and the agents asked her a number of questions, hospitalized against her will, but she was lucid and able to engage the agents in a coherent conversation. And in Siddiqui and in Eunice, that's the most important thing. And here, yes, he said, hemophilia causes me extreme pain, but he didn't appear to be in pain then. He said, yes, I haven't eaten in a couple of days, although he had, but he declined an offer of chocolate from the doctor who was sitting right in the next room. He said, yes, I haven't slept in a couple of days, although he had, but he didn't appear to be nodding off like the defendant in Taylor. They didn't have to keep waking him up. There were no false promises of leniency, which is a factor that tends to stand on separate footing. That was the Ninth Circuit case in Preston. There just isn't a case like this where courts have said, this is involuntary. We need the government to be bad actors to suppress it up to a certain point, Your Honor. The government agents here were not bad actors. This was not a due process violation. Thank you. Thank you.
judges: Brown, Wilkins, Randolph